JOSEPH MCCLELLAN, Plaintiff in Error, *v.* PHILO KELLOGG, Defendant in Error.

### ERROR TO PEORIA.

Claim and color of title, within the meaning of the statute of limitations, is the same as that given to those words by the courts, when applied to support an adverse possession.

Color of title may commence without any writing; and, if founded upon a writing, such writing need not show on its face a *prima facie* title, but may be good as a foundation for color, however defective otherwise.

Adverse possession is not to be made out by inference, but by clear and positive proof. The possession must be such as to show clearly that the party claims the land as his own, openly and exclusively.

AT the September term, 1853, of the Circuit Court of Peoria county, the plaintiff, McClellan, filed his declaration in eject-

ment against said defendant, Kellogg, for the W. half S. W. qr. of Sec. 36, T. 10 N., R. 5 E., in said Peoria county. On the 16th day of September, 1853, the defendant appeared and filed the general issue.

At the May term, 1854, of said court, the cause was tried by the court without the intervention of a jury, and judgment rendered in favor of defendant.

By the bill of exceptions, it appeared that the plaintiff, to sustain the issue on his part, proved and read in evidence to the court—1st, a certificate of the register of the land office at Quincy, Ill., of the entry of the *locus in quo*, by William B. Tucker, on the 27th of April, 1836 ; 2nd, plaintiff offered and read a deed for said land, from said Tucker to himself, duly acknowledged and recorded in said Peoria county, on the day of its execution, viz.: the 9th day of May, 1836. Plaintiff then proved, by Charles Kettelle, that the defendant claimed title to, and assumed to own, said land at and prior to the commencement of the suit ; and by Simeon D. W. Drown, that a small part of said land in the south-west corner, to wit: three or four acres, is fenced on the east and north sides, and forms part of a large field, extending south and west of said tract ; that said three or four acres, so cut off from the land in dispute, is only enclosed by fence on the east and north sides, but that there is a young hedge, one or two years old, apparently, on the west line of this eighty acre tract—the south side is open ; that, in a conversation a few months since, between defendant and witness, defendant said he was in possession of this small enclosure, and was cultivating the same, and that he had been in possession about three years. Witness further stated that the residue of the tract was unoccupied, and that defendant did not reside on or near the same. And here the plaintiff closed.

The defendant then offered and read—1st, exemplified copies from the general land office, of the register's certificate of the entry by Tucker on said 27th April, 1836, of the land in question, and of the assignment, by Tucker, on the 13th November, 1837, of his said certificate of entry, to David K. Cartter. 2nd, exemplification of patent for said land from United States to said Cartter, as assignee of Tucker, dated December 5, 1838.

Defendant next offered and read, in connection with the statutes of Ohio on the subject of acknowledgment of deeds, a deed from said Cartter to defendant, dated January 9th, 1839, for this and several other tracts of lands, containing 600 acres in all ; which deed was recorded in Peoria county on the 23rd June, 1840. To the reading of this deed plaintiff objected ; but the court allowed it to be read, and plaintiff excepted.

Defendant then called Wellington R. Kellogg, a son of defendant, who testified: that he knows said Cartter, and all the lands described in the deed from Cartter to his father; that his father had a farm of 150 acres in Ohio, rated at $20 per acre, which he exchanged for the lands in the deed, and that the *locus in quo* is of about an average value with the other lands in said deed mentioned; that this tract is separated from the others; that his father does not reside on it, and that there have never been any buildings on it; that his father is in possession of this tract, and has been since the 25th May, or 4th June, 1846; that *then*, and for several years before, one Adams, and, afterwards, one Sutton had possession of four acres in the south-west corner of the tract, and that *then* Sutton surrendered said four acres to witness, as agent for his father, and thereupon took a lease of the same from defendant, and continued to occupy and cultivate as before, but as tenant of defendant, for four years from that time; that, since then, said four acres have been cultivated, part of the time by other tenants, and part of the time by defendant himself; that the residue of said W. half S. W. qr. of Sec. 36, is still unoccupied. Witness does not remember whether any written lease was given to Sutton or not.

Said four acres first came to be enclosed thus: Adams owned lands south and west, adjoining the *locus in quo*. Wishing to make a square field about the south-west corner of this tract, he ran the east fence of his field far enough north in the tract to reach the parallel of the north line or fence of the field. From this point he ran his fence due west to the west line of his field, and so cut off and enclosed in his field said four acres; that the fences still stand as first set, and said four acres still remain part of said field; that Adams sold his land to Sutton; that neither of them ever claimed said four acres, or pretended to hold the same adversely; that when Adams sold to Sutton, he told him he had no claim to the four acres, and that Sutton must surrender the same whenever an owner appeared to claim them; that Sutton did so peaceably and willingly when he claimed for his father.

Defendant next offered and read receipts for payment of taxes by him on said land, for the years from 1843 to 1853, both inclusive, on the whole of said tract. Defendant here rested his case.

Plaintiff then read receipts for taxes of 1842 and 1844, paid by him on said land, and it was admitted that plaintiff had paid a good and valuable consideration to Tucker for the land.

This was all the proof given in the case. Plaintiff then moved to exclude the title and testimony offered by defendant,

and to find for plaintiff, which motion the court overruled, and gave judgment for defendant, and plaintiff excepted.

J. K. COOPER, for Plaintiff in Error.

MANNING and MERRIMAN, for Defendant in Error.

SCATES, C. J.   I do not deem it important to refer to all the authorities, in addition to those already referred to in *Woodward* v. *Blanchard*, 16 Ill. R. 433, 434, which sustain the general principle asserted in that case, that claim and color of title, within the meaning of general statutes of limitation, is the same as fixed and used by the courts, as sufficient to support an *adverse* possession.   That color may be given for title without a deed or writing at all, and commence in trespass ; and when founded upon a writing, it is not essential that it should show upon its face a *prima facie* title, but that it may be good as a foundation for color, however defective.   Without further discussion of that point, I simply refer to some of the many additional authorities which clearly support that principle : *Laframbois* v. *Jackson*, 8 Cow. R. 589 ; *Jackson, &c.,* v. *Young et al.*, 1 Johns. R. 157 ; *Smith* v. *Burtis*, 9 Johns. R. 180 ; *Jackson, &c.,* v. *Wheat*, 18 John. R. 40 ; *Jackson, &c.,* v. *Newton et al.*, 18 John. R. 355 ; *Jackson, &c.,* v. *Camp*, 1 Cow. R. 605 ; *Hawk* v. *Senseman et al.*, 6 Serg. and Raw. R. 21 ; *Miller et al.* v. *Shaw*, 7 Serg. and Raw. R. 129 ; *Bell* v. *Hartly*, 4 Watts and Serg. R. 32 ; *Malson* v. *Fry*, 1 Watts R. 433 ; *Frederick* v. *Searle*, 5 Serg. and Raw. R. 236 ; *Boyer et al.* v. *Benlow*, 10 Serg. and Raw. R. 303 ; *Dufour* v. *Camfranc*, 11 Mart. La. R. 715, 716 ; *Whiteside* v. *Singleton*, Meigs Tenn. R. 207.

The Act of 1839 (Rev. Stat. p. 104, Secs. 8, 9, 10) limited and confined this general principle to " claim and color of title, made in good faith," (Sec. 8,) by written or " paper title," for the " *actual* possession " will be bounded by the " extent and according to the purport" of such " paper title."   I have been unable to discover, upon careful reëxamination and consideration of the provisions and phrases of that act, and the circumstances under which it was passed—the evils with their proposed remedy—any indication of an intention to use " claim and color of title " in a different sense than that long fixed and known to the law, by repeated decisions, upon color of titles predicated upon writings.

Finding nothing in the act to warrant a departure from the established and received meaning of color, in reference to the character and goodness of writings as evidence of title, upon

which it could be predicated to sustain an adverse possession and claim, and finding the whole current of authorities supporting the rule laid down, I adopted it in argument of that case, as the meaning of our legislators, and must receive more light than has to me been shed upon it, ere I can think otherwise. This has received the sanction of the Supreme Court of the United States in the case of *Wright* v. *Matteson,* 18 How. R. p. 50, as a correct exposition of the meaning of color, under the general rule, and of our own statute, independent of any deference to it as an authoritative interpretation of it by the local courts, and in accordance with their own general decisions previously made.

Hypercriticism could, and may, present as many and great difficulties and objections to all modes and all evidence of facts tending to show the *quo animo,* or intent of the mind with which an act was done, in all other cases as well as this, where the intention of the mind must accompany the doing of an act. In any and all · such cases, while all might readily agree that certain facts and circumstances, including our different degrees of intelligence and knowledge of facts on the given subject, would be legitimate evidence tending to show, and from which the individual intent might be inferred ; yet we may readily suggest others of a doubtful, uncertain, unsatisfactory character, about the legitimate admissibility of which we might differ, and even if admissible, we might draw widely different inferences and conclusions. Such difficulties and differences among the triors in agreeing upon the influence and weight of facts, or the inferences and conclusions authorized by them, can never be adopted as a rule for the exclusion of the facts themselves, or testimony to establish them. Otherwise, the range of proof would be extremely narrow indeed, and in nine-tenths of the cases the intent could not be proven in any way. I am wholly unable to perceive how the judge, the counsel or the juror, would be in the least relieved of this difficulty in the discovery of the " good faith " or intent of the mind, by adopting, as a standard to judge the mind by, titles which are, upon their face, good, *prima facie.* Is such a title a *fixed fact,* known to and the same in every man's mind ? I presume men may—and professional ones, too—differ as much about that quality and character of title as any other. It may be for the first time settled by the court upon trial, and against it, when the party in his ignorance of *law* would learn with surprise that he had occupied and held his color of title in bad faith, while he believed in *fact* that it was genuine and sufficient.

As difficult as it may be to judge of the intelligence of men in particular given cases, and to determine whether one can be

so stupid and ignorant as to believe a title good, which an expert, or astute judge or attorney *knows* to be worthless upon bare inspection, yet it ever has been, is, and will be *true*, as a matter of *fact ;* and we must inquire, as best we may, into the actual, not the supposed, state of mind as an existing truth or fact. Ignorance of the law, and its conclusions and operation upon given facts, until adjudged, is quite as common as upon other subjects ; and that ignorance may not preclude or prejudice the party, except in those cases where from principles of public policy he is *deemed* to know it, and must answer and abide it accordingly. For certain purposes of notice of a conveyance, etc., our recording acts are of this character ; and from the recording, all persons are *deemed* to have that notice, and must abide the consequences, even though ignorant in fact of the conveyance.

Kellogg must be deemed to have had notice of the prior conveyance by his vendor, and that at the time he took the conveyance from him, he had no title to the land. It is of no strength or validity as a title to overcome the former deed. But it is unnecessary to discuss here whether such constructive notice would taint the title with bad faith, in his mind, if actually ignorant of the former deed, so as to prevent his taking possession and making adverse claim and color under it—as I am of opinion he has failed to show such adverse possession and claim under it for seven years.

This view is grounded upon the evidence and the principles of law which govern it.

Adams, to square his fields with straight lines of fence, enclosed about four acres. He took possession as a trespasser merely, without pretense or color of claim or title, but intending to hold subordinate to and under the true owner. This was neither an ouster, eviction or disseizin of plaintiff; but as the law deems every one having a conveyance to unimproved land to be seized, (Rev. Stat. 102, Secs. 1, 4,) it was in effect the adding of actual possession to his seizin through Adams, whose possession becomes that of the plaintiff. *Proprietors of Kennebeck Purchase* v. *Spring*, 4 Mass. R. 417.

The evidence of an entry by defendant to dispossess plaintiff, is founded in the verbal acknowledgment of Adams to the son of defendant, (now an heir and defendant,) that he had no claim and held subject to the true owner, and upon witness claiming title in his father, Adams took a verbal or written lease, it does not appear which, and continued to hold the same four years by himself and vendee without rent. This I deem altogether insufficient to show an ouster, dispossession or disseizin of plaintiff, for the purposes of asserting an adverse possession under color of title.

The intent to assert title in himself by his son, may be clear enough from the proof, for this must be shown. *Blunden* v. *Baugh*, 3 Croke R. 302. But the doctrine of adverse possession is to be taken strictly, and is not to be made out by inference, but by clear and positive proof, (*Bonnell et al.* v. *Sharp*, 3 John. R. 169; *Rochelle* ads. *Holmes*, 2 Bay R. 491,) and proof of actual ouster shown. 2 Espin. N. P. 9, old paging. The possession must be with such circumstances as are capable in their nature of notifying to mankind that he is upon the land, claiming it as his own, in person or by tenant—it must be visible, open, exclusive, (*Irving* v. *Brownell*, 11 Ill. R. 413); it must be hostile in its inception, and so continue, (*Turney* v. *Chamberlain*, 15 Ill. R. 273); and notorious; and not secret, as this cannot answer the purpose of notoriety to adverse claimants, cannot extinguish their claim for not being put in in due time. Adams on Eject. App. 485; Angell on Limit. 400, Sec. 4, p. 416, Sec. 13, p. 427, Sec. 19. For the law proceeds upon the presumption of an acquiescence, which cannot be where the possession and claim are unknown; and the acts of possession are such as not to give notoriety to it. Id.

These acts were not of this character. Adams' possession was merely that of plaintiff, although it might be without a knowledge of plaintiff's ownership. Defendant is the first claimant that appears, and he readily acknowledges his claim, having and making none himself. He consented to hold under him, and held on, without rent or other notice to plaintiff or the neighborhood than this private conversation, or a private, secret writing, if any, indeed, existed. A collusive, or a secret attornment of a tenant at will, or, by sufferance, paying no rent, or surrender, by trespasser, in the bare possession, surely can never be allowed to be the assertion, by possession, of an adverse and hostile claim and color of title, until a knowledge of the fact is brought home to the adversary claimant. *Laframbois* v. *Jackson*, 8 Cow. R. 589; *Smith* v. *Burtis*, 9 John. R. 174; *Jackson, &c.*, v. *Camp*, 1 Cow. R. 605; *Hawk* v. *Senseman et al.*, 6 Serg. and Rawl. R. 21; *Day et al.* v. *Cochran*, 24 Miss. R. 261.

There is no fact or change shown here that could, of itself, possibly afford the slightest notice to the neighborhood, of any assertion of an adverse claim of title, until defendant took actual possession himself, only some three years before suit.

We shall not presume that plaintiff had actual knowledge or notice of this verbal assertion of claim, and verbal assent to it, or parol lease, without rent, or other act, of which notice might be taken. See *Pipher* v. *Lodge*, 4 Serg. & Rawl. R. 310.

*Reversed and remanded.*