2020 IL App (2d) 190503-U
No. 2-19-0503
Order filed April 1, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| CHRISTINE J. VALENZIANO and C.J.W. DEVELOPMENT COMPANY, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs and Counterdefendants-Appellees, | ) ) ) ) | |
| v. | ) ) | No. 17-CH-1350 |
| RACHEL L. STEWART, f/k/a Rachel O'Connor, | ) ) ) ) | |
| Defendant and Counterplaintiff-Appellant. | ) ) ) | Honorable Daniel L. Jasica, Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  :The trial court erred in granting plaintiffs summary judgment on their claim of adverse possession over a parcel vacated by a joint tenant more than 20 years earlier: the possession by plaintiffs and their predecessors was not hostile because their use did not give the cotenant notice that her property interest was being denied.

¶ 2    Defendant, Rachel L. Stewart, f/k/a Rachel O'Connor, appeals a grant of summary

judgment (see 735 ILCS 5/2-1005(c) (West 2018)) to plaintiffs, Christine J. Valenziano and C.J.W.

Development Company (C.J.W.) on their claim to quiet title to real property.  Defendant contends

that there are genuine issues of material fact as to whether the property passed to plaintiffs by adverse possession (see 735 ILCS 5/13-101 (West 2016)). We reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4      On October 4, 2017, plaintiffs filed a three-count complaint, alleging the following core facts. In 1961, defendant married John O'Connor. On or about August 9, 1963, they purchased residential property at 57 Hillcrest Avenue in Fox Lake, becoming joint tenants. In 1968, defendant left O'Connor, moved out of Illinois, and had no further contact with the property; she did not pay the mortgage, taxes, or expenses. Also that year, she and O'Connor, who had no children together, were divorced.

¶ 5      Shortly afterward, O'Connor remarried a woman named Gloria, and, on November 9, 1968, their daughter, Christine [Valenziano], was born. O'Connor, Gloria, and Valenziano resided on the property, exerted full control over it, and paid the mortgage, taxes, and expenses. In 1991, Valenziano married and moved out. On or about April 28, 1993, O'Connor died. On September 2, 2010, Gloria quitclaimed her interest in the property to Valenziano. On September 4, 2010, Gloria died. Valenziano continued to exercise control over the property, paying the mortgage, taxes, and expenses.

¶ 6      On or about May 30, 2016, a fire gutted the house. Valenziano contracted with C.J.W., a entity that she and her husband Michael owned, to demolish the house and build a new one. On or about August 28, 2017, Valenziano deeded the property to C.J.W.

¶ 7      Count I, the only count at issue here, alleged that Valenziano and C.J.W., in succession, had become the owners in fee simple of the property, based on adverse possession. For clarity, we note that count II alleged that Valenziano and C.J.W., in succession, had acquired title to the property based on their actual and continuous possession and title for seven or more years (see *id.*

§ 13-107) and count III alleged that they had acquired title based on the payment of taxes with color of title for seven successive years (see *id.* § 13-109).

¶ 8    On November 18, 2017, defendant filed a counterclaim. It alleged in part that, when she vacated the property in 1968, she did not relinquish her interest in it, but had permitted O'Connor and his family to reside at and use the property. Defendant had the expectation that she would be compensated for her interest when the property was either sold or no longer used as a primary residence by O'Connor and his family. O'Connor's death made defendant the sole titleholder. Valenziano had not resided on the property since the 2016 fire, at the latest, but plaintiffs attempted to sell the property, without defendant's knowledge or consent. Count I of the counterclaim sought ejectment. Count II sought a declaratory judgment that defendant was the sole titleholder because the deeds from Gloria to Valenziano and from Valenziano to C.J.W. had conveyed nothing.

¶ 9    Defendant moved to dismiss the complaint. On February 1, 2018, the court dismissed count II only.

¶ 10    On February 15, 2018, defendant filed an amended counterclaim and on May 24, 2018, plaintiffs answered it.

¶ 11    On May 25, 2018, plaintiffs moved for summary judgment. In addition to the undisputed facts set forth above, plaintiffs alleged that Valenziano resided on the property from her birth until she married and moved out and, afterward, resided in the Fox Lake area and visited the property at least weekly. O'Connor and Gloria continued to reside at the home full-time. Between Valenziano's birth in 1968 and O'Connor's death in April 1993, O'Connor and Gloria paid all the mortgage obligations, taxes, and expenses. They resided on the property without ever asking or receiving permission to use or control it. They had no communication, direct or indirect, with defendant concerning the property.

¶ 12    Since receiving the quitclaim deed in 2010, Valenziano had paid all the expenses and taxes, insured the property, and maintained it.   Valenziano and Michael made major needed improvements.  In February 2016, Valenziano allowed her stepson Steven to lease the house and reside on the property.  After the house burned down and was rebuilt, Valenziano transferred title to C.J.W.  In 2017, while C.J.W. attempted to sell the property, Valenziano learned that defendant had a title interest in it.  At all times previously, Valenziano had believed that her parents had been the sole titleholders, and she had never asked for or received permission to use or control the property from anyone other than them.

¶ 13    Plaintiffs contended that, as a matter of law, they were entitled to the property through adverse possession.  They contended that they and their predecessors had possessed the property for at least 20 years and their possession was (1) continuous, (2) hostile or adverse to the true owner's interest and to the world at large, (3) actual, (4) open, notorious, and exclusive, and (5) under a claim of title inconsistent with that of the true owner.  See *Gacki v. Bartels*, 369 Ill. App. 3d 284 (2006). . They argued as follows.

¶ 14    In 1968, Valenziano's parents started their sole possession of the property, which lasted until O'Connor's death in 1993.  At that time, defendant became the sole record titleholder. Thereafter, Gloria and Valenziano were in sole possession of the property.  Successive periods of possession may be tacked together if there has been privity between the users, and there had been privity between O'Connor and Gloria and between Gloria and Valenziano.  Thus, plaintiffs and their predecessors had continuously and exclusively possessed the property for 49 years.

¶ 15    Under the heading, "Disseizin [Ouster] of Cotenant," plaintiffs argued as follows.  The law presumes that if only one cotenant enters the property and takes the rents and profits, the entry has been with the permission of the other cotenant(s).  However, this presumption can be rebutted by

acts that show that he means to hold exclusively for himself "without being accountable to anyone." (Internal quotation marks omitted.) *Nickrans v. Wilk*, 161 Ill. 76, 79-80 (1896). Here, between defendant's departure in 1968 and O'Connor's death in 1993, he and Gloria controlled the property exclusively. O'Connor, defendant's cotenant, held the property without being accountable to her. Defendant never attempted to enter or use the property and never requested any accounting of his use. Therefore, ownership by adverse possession accrued in O'Connor before his death in 1993.

¶ 16    Plaintiffs argued next that the possession by O'Connor and his successors had been hostile or adverse, *i.e.*, incompatible with that of the true owner and anyone else. See *Joiner v. Janssen*, 85 Ill. 2d 74, 81 (1981). They reasoned that they and their predecessors had controlled the property exclusively for more than 49 years without regard to the interest of defendant or anyone else.

¶ 17    Plaintiffs argued next that there was no basis to find that defendant had permitted any of the foregoing possession and use. They noted that, because the property had not been vacant, it must be presumed that the use was not permissive. See *Poulos v. F.H. Hill Co.*, 401 Ill. 204 (1948). In her deposition (a copy of which was attached to plaintiffs' motion), defendant admitted that she could not recollect any agreement with O'Connor about the use of the property. She could not recall talking with him about the property either shortly before she vacated it or at any time afterward. Asked whether she had had any such discussions or agreements, she answered, "No." Asked whether she recollected permitting anyone to use the property, she said no.

¶ 18    Plaintiffs argued next that the requisite possession had been actual, open, notorious, exclusive, and under a claim of title inconsistent with defendant's claim. They noted that they and their predecessors had continually engaged in acts consistent with ownership, including insuring,

maintaining, remodeling, rebuilding, and paying all of the expenses related to the property, and also exclusively controlling who had access to the property.

¶ 19    Defendant filed a response to plaintiffs' motion for summary judgment. As regarded count I, she argued first that plaintiffs had not shown adversity (hostility) as a matter of law. When she departed in 1968, she raised no objection to O'Connor residing on the property, and it was not until 2017 that she learned of his death. Gloria and Valenziano resided there initially because of their family relationship to O'Connor, defendant's joint tenant. In 1993, O'Connor's death ended the joint tenancy. There was a genuine factual issue of whether Gloria's and Valenziano's possession thereafter was hostile or permissive. Defendant cited *Hansen v. National Bank of Albany Park in Chicago*, 59 Ill. App. 3d 877 (1978), for the proposition that a claimant who comes into possession believing that he is not the record title holder does not possess the property adversely. She concluded that Gloria could not have believed that she was the record title holder in 1993, as the last recorded deed for the property was dated 1963.

¶ 20    Defendant argued next that there was a genuine issue of fact as to whether the allegedly adverse possession had been continuous for at least 20 years. She asserted that, after O'Connor died, Gloria possessed the property for 17 years and Valenziano could not tack her possession onto Gloria's, because under *Applebey v. Lenschow*, 144 Ill. App. 3d 208 (1986), a claimant may rely on the adverse possession only of a predecessor in title. Defendant also contended that O'Connor could not have disseized her, because *Nickrans* involved tenants in common, not joint tenants.

¶ 21    Defendant filed a statement of material facts, based primarily on her deposition, which was taken August 27, 2018, in Florida. These included the following. After she left O'Connor, she obtained an uncontested divorce, but she no longer had any of the documentation. She did not object to his residing on the property with his new family while he was alive. She had expected

that, when O'Connor passed away, she would receive her share of the property. Until 2017, defendant had assumed that O'Connor was still residing on the property.

¶ 22    Defendant's deposition also stated that, after leaving the property, she went to live with her brother in Connecticut. She did not leave a forwarding address or tell O'Connor where she had gone. She knew no reason why he would have learned her whereabouts. Shortly afterward, she obtained the divorce. Later (she could not recall the year), she married John Stewart. They resided in California for approximately 15 years, then New Hampshire for approximately 5 years. In approximately 2000, they moved to Florida. About four years after the move, Stewart passed away. Defendant still resided in Florida.

¶ 23    Defendant testified that, between 1968, when she left O'Connor, and 2017, when she received Valenziano's letter, she never received any communication or information about the property. She did nothing and did not discuss it with her children or other family members. Asked whether O'Connor or anyone from his family had ever contacted her before 2017 about her title to the property, defendant responded, "Nope."

¶ 24    In their reply, plaintiffs argued that there were four separate periods to consider. In the first period, from 1963 to 1968, O'Connor and defendant acquired the property as joint tenants and resided there together. In the second, from 1968 through 1993, defendant vacated the property and then divorced O'Connor without making any agreement about the property or communicating with O'Connor at all about it. In this period, O'Connor and Gloria resided there and took all the financial responsibility, including paying the mortgage until it was fully satisfied in 1983. In the third period, from O'Connor's death in 1993 until Gloria's death in 2010, defendant, as surviving joint tenant, was the sole titleholder to the property, but Gloria continued to control it and use it as her principal residence. Shortly before her death, she quitclaimed the property to Valenziano. In

the fourth period, from 2010 through the present, Valenziano controlled the property, making major improvements at her expense. Only in 2017, when she put the property on the market, did Valenziano discover defendant's interest in it. For 49 years, defendant never returned to the property or had any agreement with anyone about it.

¶ 25    Plaintiffs argued that there was no factual basis to contend that any use had been permissive. They argued next that there was no factual dispute that the possession had been continuous for at least 20 years, as they and their predecessors had exercised ownership for that long. Finally, they argued that *Nickrans* was not limited to tenants in common.

¶ 26    The trial court granted plaintiffs summary judgment on count I of their complaint, plaintiffs moved for summary judgment on defendant's counterclaim, and defendant moved to reconsider the summary judgment. On May 30, 2019, the court granted plaintiffs summary judgment on the counterclaim, and denied defendant's motion to reconsider. Defendant timely appealed.

¶ 27                                        II. ANALYSIS

¶ 28    On appeal, defendant contends that the trial court erred in granting plaintiffs' summary judgment on count I. For the following reasons, we agree.

¶ 29    Summary judgment is proper if and only if the pleadings, depositions, and other matters of record establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Gacki*, 369 Ill. App. 3d at 289. In considering a motion for summary judgment, the court must construe the evidence strictly against the movant and liberally in favor of the nonmovant. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). Summary judgment should be granted only when the movant's right to it is clear and free from doubt. *Id.* Our review is *de novo*. *Gacki*, 369 Ill. App. 3d at 289.

¶ 30    To establish title to real property by adverse possession, "there must be 20 years' concurrent existence of the five elements: (1) continuous, (2) hostile or adverse, (3) actual, (4) open, notorious, and exclusive possession of the premises, (5) under a claim of title inconsistent with that of the true owner." *Joiner v. Janssen*, 85 Ill. 74, 81 (1981).

¶ 31    Defendant's first contention is that there is a genuine issue of fact on hostility. She argues that plaintiffs did not establish this element for any of the three periods into which the case can be divided: (1) between her departure in 1968 and O'Connor's death in 1993, during which she and O'Connor were cotenants; (2) between O'Connor's death in 1993 and September 2010, during which defendant held sole title to the property but Gloria resided there full time; and (3) between September 2010 and 2017, when Valenziano purportedly succeeded to Gloria's interest and paid all the taxes and expenses but did not reside there.

¶ 32    Defendant's argues that, throughout all three periods, any possession of the property was with her permission and therefore not hostile. She notes that, when she left the property in 1968, she did not object to O'Connor and his new family continuing to reside there while he was alive. She notes further that, upon O'Connor's death in 1993, Gloria and Valenziano continued to reside there solely because they did not notify defendant of O'Connor's death.

¶ 33    Although we hold that there is a genuine question of whether plaintiffs established hostility for the required 20 years, we disagree with much of defendant's reasoning. First, she confuses permission with acquiescence. These terms are not synonymous but mutually exclusive. As this court has stated, to be adverse, "the use must be with the knowledge and *acquiescence* of the owner but *without his permission*." (Emphases added.) *Light v. Steward*, 128 Ill. App. 3d 587, 595 (1984). Thus, the use of the property by others without objection by the true owner is not permission but might be acquiescence. See *Schultz v. Kant*, 148 Ill. App. 3d 565, 572 (1986)

(plaintiffs' use of roadway without asking permission of defendant, of which defendant knew but to which he did not object, established "acquiescence and not permission" and thus established adversity needed for easement); *Light*, 128 Ill. App. 3d at 595-96 (trial court properly found that defendants' use of lane on plaintiffs' property was adverse, because court was entitled to discredit plaintiffs' testimony that parties had agreed to defendants' use of lane and credit defendants' testimony that they did not enter into any such agreement); *Burrows v. Dintlemann*, 41 Ill. App. 3d 83, 86 (1976) (defendant proved that his use of road was adverse, as trial court found that he told plaintiff that he claimed the right and plaintiff's response that he could do so was not permission but acquiescence).

¶ 34    To the extent that defendant concedes that O'Connor, Gloria, and Valenziano occupied the property without asking her permission or receiving any indication from her either way, she strengthens the argument that plaintiffs showed adversity as a matter of law.

¶ 35    Defendant's reliance on *In re Estate of Cargola*, 2017 IL App (1st) 151825, is also unavailing. Cargola, acquired real property in 1991, and the mortgage and title were in her name. In 2007, she died intestate, leaving two heirs, her daughters Briese and Knorrek. In 2014, Knorrek filed an action to remove title to the property from Cargola's estate and vest it in her. She relied partly on a claim of adverse possession. She alleged that, in 1991, Cargola and Knorrek agreed that Cargola would purchase and hold title to the property but that Knorrek would be the true owner; that Knorrek supplied funds to Cargola, who then made the down payment and obtained a mortgage in her own name; that, since 1991, Cargola had never resided at the property but Knorrek had done so continuously and paid the mortgage, taxes, and expenses; and that, when the mortgage was refinanced in 2001 and 2003, both Cargola and Knorrek were listed as borrowers. Knorrek

alleged that her possession of the property had been hostile because Cargola had never permitted her to reside there. *Cargola*, 2017 Il App (1st), 151823, ¶¶ 3-9.

¶ 36    Briese moved to dismiss the complaint. She contended in part that, as a matter of law, the agreement between Cargola and Knorrek meant that Knorrek's possession of the property had been permissive. The trial court dismissed the complaint. Knorrek appealed the dismissal only of the adverse-possession count. *Id.* ¶¶ 10-12.

¶ 37    The appellate court affirmed, agreeing with Briese that the adverse-possession claim did not plead facts to establish hostility. That required "an assertion of ownership incompatible with any other claim." *Id.* ¶ 19. Knorrek argued that her possession was adverse because she was residing at the property openly and acting as its owner, which were inconsistent with Cargola's claim of title. *Id.* ¶ 20. In support, she cited *Brandhorst v. Johnson*, 2014 IL App. (4th) 130923, but in that case the nonowner had asserted dominion over the property at issue " '*without any agreement* to do so.' (Emphasis added.)" *Id.* (quoting Brandhorst, 2014 IL App 4th 130923, ¶ 46). In contrast, in the 1991 agreement, Cargola indisputably gave Knorrek permission to reside there. *Id.* ¶¶ 8, 21.

¶ 38    Defendant attempts to equate *Cargola* with this case by arguing that the agreement there was no more specific than "the [agreement]" between her and O'Connor and his successors. But defendant simply repeats her conflation of permission with acquiescence. Failing to contest a claimant's occupation of property is not the same as granting permission to use it. Defendant's reliance on *Cargola* is misplaced.

¶ 39    Defendant argues next that permissive use was proved because Gloria and Valenziano knew or should have known that neither one was the record title holder, as the last deed to the property was recorded in 1963 and made defendant and O'Connor the sole titleholders. Defendant

relies on *Hansen*'s holding that, "[w]hen an adverse claimant comes into possession of land thinking that he is not the record title holder, such possession lacks the requisite hostility for claiming title by adverse possession." *Hansen*, 59 Ill. App. 3d at 879.

¶ 40 Defendant's reliance on *Hansen* would be more persuasive had it not been overruled long ago. In *Joiner*, the plaintiffs claimed adverse possession of a strip of the defendants' property. The strip had been specifically excluded in the contract by which the plaintiffs had purchased their property from the defendants' predecessors; however, they used the property with the defendants' acquiescence for more than 20 years until the defendants recognized the mistake and claimed possession. At that point, the plaintiffs filed an action for adverse possession and prevailed in the trial court. The appellate court reversed, relying on the language in *Hansen* on which defendant now relies. *Joiner*, 85 Ill. 2d at 80.

¶ 41 The supreme court reversed the appellate court and affirmed the trial court. It held that *Hansen* "[was] simply not an accurate statement of the law." *Id.* The court explained that a party claiming title by adverse possession always does so in derogation of the rights of the real owner and admits that title is in another. *Id.* Therefore, "[t]o hold that because the possessor knows or should know that record title is in another precludes any possibility of the possessor's title being adverse is the antithesis of the doctrine of adverse possession as it has existed in this State." *Id.* at 81; see also *Bakutis v. Schramm*, 114 Ill. App. 3d 237, 240-41 (1983) (recognizing that *Joiner* overruled *Hansen* and thus holding that "[the plaintiffs'] knowledge of lack of title would be entirely consistent with their possession being adverse"). *Hansen* was overruled in 1981 and it is still bad law.

¶ 42 Defendant's attempt to raise a factual issue as to adversity fails insofar as it is based on either permission or what her successors in possession knew or should have known about the

record title. Nonetheless, defendant does provide valid grounds for a genuine issue of fact as to adversity, based on the arguable lack of notice to defendant.

¶ 43    We turn first to the period between defendant's departure in 1968 and O'Connor's death in 1993. Their status as joint tenants and titleholders would defeat a claim of adverse possession for this period, unless plaintiffs could show that, at some point, O'Connor effected a disseizin of defendant.

¶ 44    Plaintiffs cite *Nickrans* for the proposition that a cotenant may disseize another cotenant. Indeed, "to constitute a disseizin of a co-tenant by a tenant in common, there must be an ouster, or some act which the law deems equivalent to an ouster." *Nickrans*, 161 Ill. at 80. Defendant argues that *Nickrans* is distinguishable because it involved tenants in common and not joint tenants. However, she provides no reason to distinguish between the two types of cotenancy and no authority doing so. Although there is a dearth of Illinois cases applying *Nickrans* to joint tenants, foreign authority suggests that "[a] cotenant, whether a tenant in common or a joint tenant, may undoubtedly hold the common premises adversely to his cotenant or cotenants, and in such fashion as eventually to ripen his claim into title against them, even though his possession was commenced amicably as a cotenant." W.W. Allen, Annotation, *Adverse Possession Between Cotenants*, 82 A.L.R.2d 5, 23 (1962); see also *Cawood v. Middleton*, 261 S.W. 242, 243 (Ky. 1924). As neither reason nor precedent impedes extending *Nickrans* to joint tenants, we shall do so.

¶ 45    Having held that a joint tenant can disseize a cotenant, we now consider whether plaintiffs proved as a matter of law that O'Connor did so (and if so, when). We note that "[t]he evidence to sustain an ouster by a co-tenant must be stronger than the evidence to sustain ordinary adverse possession." *Nickrans*, 161 Ill. at 81. More specifically, the supreme court has held:

> "Ordinarily, the possession of one co-tenant is the possession of all, but it may be adverse, provided he asserts exclusive ownership and denies all right or title in his co-tenants, either by means of a formal notice or by such overt acts of exclusive ownership as to give notice to the co-tenants that an adverse possession and disseizin are intended to be asserted." *Biggins v. Dufficy*, 262 Ill. 26, 29 (1914).

¶ 46    Thus, disseizin requires both the assertion of adverse title through acts of dominion or control and some type of notice to the cotenant. The former can supply the latter, but the standard is high:

> "[N]otice need not be a formal one, directed to the co-tenants, but may consist of overt acts of exclusive ownership of such a nature as to give notice to the co-tenants that an adverse possession and disseizin are intended to be asserted. If acts are depended on ***, they must be of such an unequivocal character and of such a nature as by their own import to impart information to the co-tenants that their right and title are denied and the possession is held adversely to any claim they may have." *Roberts v. Cox*, 259 Ill. 232, 235-36 (1913).

¶ 47    O'Connor's mere continued residence on the property did not impart to defendant that he was denying her right and title, as he was defendant's cotenant. His possession was her possession (*Biggins*, 262 Ill. at 29-30), unless plaintiffs could establish both that he engaged in hostile acts of dominion and that he gave her some sort of notice, direct or indirect. To tack on the period from 1968 to 1993 to support the summary judgment, plaintiffs needed to establish *both* propositions as a matter of law, clear and free from doubt. Even if plaintiffs established as a matter of law that O'Connor engaged in hostile acts of dominion—which we need not decide—they made no such showing on the element of notice.

¶ 48    The evidence on notice may be summarized as follows.  In 1968, defendant left the property without telling O'Connor where she had gone.  Subsequently, she resided in Connecticut, California, New Hampshire, and Florida.  Between her departure in 1968 and her receipt of the letter in 2017, there was complete silence between her and the O'Connor family on the matter of the property.  During that period, defendant never attempted to raise the subject with O'Connor, Gloria, Valenziano, or anyone else.  But equally, O'Connor and his successors in possession never attempted to raise the matter with defendant.

¶ 49    This silence works against plaintiffs.  The notice required of ouster may be explicit—a formal declaration—or implicit—actions that by their nature "*give notice* to the co-tenants that an adverse possession and disseizin are intended to be asserted." (Emphasis added.) *Biggins*, 262 Ill. at 29 (1914).  But something must reasonably place the cotenant(s) on notice of the claimant's assertion of his right.

¶ 50    Here, we cannot say that, as a matter of law, O'Connor gave defendant the required notice. Plaintiffs have never contended that O'Connor provided explicit notice to defendant of his claim of ouster.  Instead, they argue that his actions gave implicit notice, in that, after defendant decamped, he exerted full control over the property, residing there with his new family, paying all the taxes, making improvements, and so on.  However, his acts of dominion do not automatically establish notice to a cotenant.  "Mere possession by one tenant in common, who receives all the rents and profits and pays the taxes assessed against the property, no matter for how long a period, is not sufficient to overcome the presumption of law that the possession of one is the possession of all."  *Roberts*, 259 Ill. at 235.  Such acts must "*impart information to the co-tenants* that their right and title are denied." (Emphasis added.)  *Id.* at 236.

¶ 51    Because informing the cotenant that his right and title are being denied is necessary to providing the required notice, it is not surprising that notice by acts has been found when the cotenant is in a position (literally and figuratively) to be aware that the claimant has undertaken the acts. See *id.* ("[i]t was certainly understood by the other tenants in common living in the same vicinity, that [cotenant] and his devisees claimed exclusive ownership and denied all right or title in any other person"); *Guinzy v. Kratz*, 28 Ill. App. 3d 500, 504 (1975) (cotenant sometimes visited property, actually knew of claimant's exercise of acts of dominion over property, and declined to demand rent or assert any title).

¶ 52    When the cotenant was not in a position to learn of the acts, and there was no evidence that she ever did, the result was different. In *Andrews v. Floyd*, 308 Ill. 559 (1923), on the death of the property's original owner, his two daughters each received an undivided one-half interest in the land. Several decades later, the plaintiff inherited one half-interest and the defendants inherited the other half. The plaintiff sued to partition the property, and the defendants claimed that they had obtained her interest by adverse possession.

¶ 53    The supreme court ultimately rejected the defendants' claim of adverse possession. The court noted that, for more than 20 years before the plaintiff filed her suit, the defendants and their predecessors had controlled the entire parcel, paying the taxes, collecting the rents, and making improvements. But they never consulted the plaintiff about the management of the property. Only once, when all the parties resided in Pennsylvania, did the plaintiff ask a defendant about it. The defendant replied that the property was not his concern but that could be readily sold. The plaintiff made no further inquires until she learned that it was valuable. *Id.* at 565.

¶ 54    The defendants claimed adverse possession based on their continuous possession, appropriation of rents, payment of taxes and insurance premiums and rebuilding a house that had

burned down. The court held, however, that they had failed to show "that in some way [the plaintiff] was notified that their taking possession was hostile, adverse, and an actual disseizin was intended to be asserted against her." *Id.* at 566. The defendant' letter had reassured the plaintiff that she had title and had lulled her into inactivity by falsely telling her that the property was not marketable. *Id.* at 567. More generally, the defendants had not shown that "at any time after they entered into possession they in any way or by any act gave [the plaintiff] notice they were holding the land adversely to her." *Id.*

¶ 55    *Andrews* applies to defeat plaintiffs' adverse possession claim. Between 1968 and his death in 1993, O'Connor did nothing by word or deed to inform defendant that he was claiming her interest in the property. His acts of dominion over Illinois property could not reasonably have been expected to communicate anything to a cotenant who was in Connecticut or California. Thus, adverse possession as a matter of law cannot be based on the period from 1968 through 1993. Of course, that still leaves more than 20 years between the death of O'Connor and the filing of plaintiffs' complaint.

¶ 56    From O'Connor's death in 1993, which made defendant sole titleholder, to September 2010, when Gloria deeded the property (or purported to deed the property) to Valenziano, Gloria occupied the property full time, paid the taxes, made improvements, and otherwise acted as though she were the true owner. Nonetheless, the issue of notice is dispositive. Although Gloria could not claim to disseize defendant as a cotenant, she still had to provide some sort of notice that she was claiming ownership.

¶ 57    "The 20-year period should not start running *** until the titleholder has a visible, objective reason to know that someone is trespassing. The period cannot run on the sly." *McNeil v. Ketchens*, 397 Ill. App. 3d 375, 393 (2010). Acquiescence "cannot be where the possession and

claim are unknown, and the acts of possession are such as not to give notoriety to it." *McClellan v. Kellogg*, 17 Ill. 498. 503 (1856). Courts routinely speak of acts that "will indicate to *persons residing in the immediate neighborhood* who has the exclusive management and control of the land." (Emphasis added.) *Augustus v. Lydig*, 353 Ill. 2d 215, 222 (1933); see also *Joiner*, 85 Ill. 2d at 82; *McNeil*, 397 Ill. App. 3d at 395. However, we do not view this common phrase as dispensing with the need for notice to a true owner who is absent from the area.

¶ 58　　In the vast majority of adverse-possession cases, the true owner does reside in the immediate neighborhood—most likely, adjacent to the claimed property. If not, he or she might visit such adjacent or nearby property, as boundary disputes and misdrawn maps are routinely sources of adverse-possession actions. Thus, notice to those in the immediate neighborhood is tantamount to notice to the true owner. However, the concept of hostility still requires notice to the titleholder, including one not residing nearby. That was the holding in *Andrews*, and we see no reason to limit the requirement to cotenant ousters. Those who claim property against the sole titleholder should be held to the same standards as those who claim an undivided fractional interest against a fellow titleholder—and the law does not say otherwise. Acquiescence must be on the part of the true owner, not those who reside in the neighborhood. The acts of the would-be adverse possessor must be "brought home to the adverse claimant." *McClellan*, 17 Ill. at 503.

¶ 59　　In light of the foregoing, we hold that the grant of summary judgment cannot be based in any part on the period from O'Connor's death in 1993 through Gloria's death in 2010.

¶ 60　　We dispose of two remaining arguments that defendant makes. First, in a single sentence, she contends that Valenziano should be dismissed as a plaintiff for lack of standing, because she transferred her interest to C.J.W. in 2017. However, in the trial court, defendant never moved to dismiss Valenziano. The argument is forfeited, because lack of standing is an affirmative defense

that must be raised in the trial court. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 508 (1988). Finally, although it is not strictly necessary, we consider the period from Gloria's death through the filing of this action. Defendant contends that Valenziano may not tack her period of possession onto Gloria's 17-year possession. Noting that Gloria never had legal title to the property, she argues that under *Applebey v. Lenschow*, 144 Ill. App. 3d 208, 214 (1986), plaintiffs may rely "only upon the adverse possession of his predecessor in title." There are two problems with this argument. First, *Applebey* says no such thing. It states only that "adverse possession by successive *occupiers* of land may be tacked together to establish a continuous possession for the statutory limitation period." (Emphasis added.) *Id.* Second, the argument is absurd. By definition, a claim of adverse possession presupposes that the claimant, and any predecessors whose periods of occupancy may be tacked on, did *not* have title to the property claimed (although one or more might have had title to adjoining property, as in *Applebey*.) Requiring a claimant to show that her predecessor had title to the property would make tacking impossible.[1]

¶ 61    Nonetheless, the issue of notice is once again dispositive. As far as the record discloses, in the period between Gloria's death and defendant's receipt of the letter informing her that the property was for sale, defendant received no notice by word or acts that Valenziano or C.J.W. was claiming her title to the property. If anything, the evidence for notice by acts is even weaker than for the prior periods, as Valenziano did not reside at the property full-time. In any event, to the

---

[1] Defendant also argues that plaintiff's claim is falsely premised on the 2010 and 2017 deeds, which were not in the "chain of title." Again, defendant is correct that Gloria had no title to the property. And, again, she is incorrect that this is relevant to adverse possession.

extent that we need consider the period of 2010 to 2017, it does not support the grant of summary judgment for plaintiffs.

¶ 62    We hold that the trial court erred in holding that, as a matter of law, plaintiffs established adverse possession.  Nothing in our order limits the scope of the evidence or issues on remand, including at trial, if there is to be one.

¶ 63                                III. CONCLUSION

¶ 64    For the foregoing reasons, we reverse the judgment of the circuit court of Lake County, and we remand the cause.

¶ 65    Reversed and remanded.